You've all been here before, but I would say you do have technically 30 minutes per side. If you really think you need it, fine. We won't arbitrarily constrain you, but it depends on the quality of what you've got in your favor. We appreciate record citations. The record in this case is probably very long by now. So with that, I would call Mr. Ryder Longmaid for Mr. Reed. Thank you, Your Honor. May it please the Court, Parker Ryder Longmaid for Plaintiff Appellant and Movement Rodney Reed. I'd like to reserve five minutes for rebuttal. Reed wants to DNA test the murder weapon to show he didn't kill Stacey Stites. If DNA testing shows a high concentration of someone else's DNA in the webbing of the belt, like Jimmy Fennell's, it would provide powerful evidence that Reed didn't commit the crime. That DNA would have gotten there from the perpetrator's skin cells in his sweat as he struggled to strangle Stites, gripping the belt for several minutes with such force that it eventually broke in two. But District Attorney Brian Girt says no testing, not even at Reed's attorney's expense. He relies on unconstitutional requirements in Article 64, and he continues to say no, though testing would take just days and cost the state nothing. But you've already lost that case, right? Your Honor, we are claiming here, of course. We can't review the state court decision against testing, which the Supreme Court denied cert on, right? Well, as Your Honor knows, we went up to the Supreme Court on the statute of limitations issue, and Girt's raised- State courts had denied testing, hadn't they? They had, Your Honor, and Girt's made this Rooker-Feldman argument, which I think is along the lines of what Your Honor is suggesting. And the Supreme Court said no. What we're challenging, and also this Court's 2021 opinion that went up to the Supreme Court said, what we're challenging is the construction of Article 64, not the application in that particular decision to Rodney. That's my point. Well, Your Honor, we still have an ongoing request to test this DNA, but we're unable to get it because, as we allege in the complaint, Brian Girt's is relying on these unconstitutional requirements in Article 64 to deny testing. So, for example, I want to talk about the non-contamination requirement because this is- Before you start on each individual element, would Reid have to win on all three to be able to get this evidence? He would not, Your Honor, and I think the simple reason is that, I'd say two reasons. First is that the CCA didn't say anything about the scope of the exculpatory evidence, didn't look at any evidence from the testing that would have been provided if we'd looked at the contaminated evidence, right? So we have nothing from the CCA about the belt. What we really want is testing of this murder weapon. The belt that everyone agrees was used to strangle Stacey Stites. The CCA didn't say anything about the belt. And perhaps Your Honor is referring to the Gutierrez case, and whether there's ultimately a standing problem or a merits problem, but there's not, because there's nothing from the CCA about the vast majority of the items we want to test, including, most importantly, the belt. And the second reason- You're going quickly. You do have plenty of time. So we've been reversed on timeliness. And in Gutierrez, it's been confirmed that Gutierrez has standing. Right. Well, so, Your Honor, it goes back to Judge Jones' question as well. There's no jurisdictional problem before the court. This court- You say there was. I objected to your- But that's okay. Go ahead. Go on. Both- Speaking of the Rooker-Feldman issue, Your Honor, but of course, either way, both this court and its 2021 opinion that went up and the Supreme Court said there's no jurisdictional problem as a matter of standing at Rooker-Feldman or Ex parte Young. And the reason there's not is we're challenging the continued denial of testing, prospectively. We can't get testing because as long as Gerst is relying on these unconstitutional requirements in Article 64, we'll never be able to get testing. And there's not some other finding that's preclusive that would somehow come up when we make a future request. The other reason is the unreasonable delay finding that the CCA made in that opinion. But that had to do with the circumstances of the particular request in 2014, which was made on the same day as the state moved to set an execution date. And- So, just-  Oh, go ahead. Do you agree, though, that you can only challenge, Reid can only challenge the constitutionality of Chapter 64 as written and interpreted by the Texas State Court in general, not as to the specific application on the specific claims as that would be Rooker-Feldman, even though the court said that the previous case wasn't Rooker-Feldman? So, Your Honor, I think in the briefing and also the briefing before the Supreme Court, there was a lot of back and forth about what's a facial challenge or what's an as-applied challenge. What everyone agrees on, including the Supreme Court, is we can't, under Rooker-Feldman, challenge the actual decision of the CCA here, which is not what we're doing. But- Why don't you have to win on all three? When? So, I think Judge Higginson was asking a similar- He asked you the same question, but in light of that, why don't you have to win under all three? Well, first of all, I would just point out law of the case. Supreme Court says we have standing to make this challenge, and we raised all three of these arguments before the Supreme Court. But more importantly, we are challenging all three. But one of the reasons we don't have to is that the Court of Criminal Appeals said nothing about the evidence that it thought was contaminated. There's no preclusive holding there. So, we want to test the murder weapon. It didn't evaluate- So, you managed to get that argument through the Texas Court of Criminal Appeals without ever saying what evidence you wanted tested? Of course, Your Honor, we asked for- Of course you did. So, I don't understand your argument that all we want is the belt now. Well, there's a number of items we want tested. But this is a record on appeal 294. This is from the opinion of the CCA. It has already gone through the non-contamination analysis. Yes, but all we have to do is look at the briefs and public record. I don't under- Just go on with your argument. I don't understand where that point gets you at all. The point is that I could see the state making a Gutierrez-type argument and saying if the CCA had already factored into its analysis what the exculpatory value or, in its view, perhaps lack thereof, of the belt would have been. But there is no such finding. Because what the CCA does, and this is on page 294, when we remove the items that are contaminated, tamper with, or altered in a material way from the items that we conclude contain biological evidence, we are left with the following items. And it's a short list of items there that does not include the belt. So, there's nothing about the belt on there. Loop back, if you don't mind, to Judge Elrod's question, which is, are we assessing Chapter 64 on its face as written? And if so, because you want to get right to the contamination requirement, where is that contamination requirement? Which, this is another way of saying, can you distinguish between a chain of custody, which I think Texas, like 49 other states, probably don't dispute that. And yet, you're saying there's something plus here that makes it fundamentally unfair. How do you do that on a facial attack? That's right, Your Honor. I do want to address how this is different from a normal chain of custody requirement. But, again, I think there's some semantic slippage in the notion of what's a facial attack. We're not looking at the actual words of Article 64 here, and in that sense, looking at what is on the face of the paper. We're talking about what the law means as construed by the Court of Criminal Appeals. And it happens to have been construed in this case. So if you look at the Court of Criminal Appeals opinion, it is adding for the first time this non-contamination requirement. It's immaterial at this point that it's adding it. We had that discussion with the Supreme Court for statute of limitations purposes. It gave us our ruling. But the point is, there is now a non-contamination requirement that is part of Article 64. It applies not just to Reed. It applies to everyone else in Reed's circumstance. So in that sense, Judge Elrod, it is facial. And what this requirement is, Judge Higginson, is it is a conclusive, irrebuttable presumption. If people have handled the evidence without gloves, you can't get DNA testing of those items. Okay? But this Court, I want to emphasize, in Fasano, United States v. Fasano, in 2009, construed the Federal Innocence Protection Act, was presented with a request to construe it similarly to how the CCA has construed it here. And the Court rejected that request. Now, that was in the trial context, correct? This was in the context, I believe it was— Post-conviction. I'm not saying that's a distinction that really makes a difference. But Fasano was— I don't—Your Honor, as you suggest, I don't think it makes a difference. Because although it wasn't a constitutional issue in Fasano, what the Court was looking at is, what is a sensible, non-arbitrary construction of the chain of custody requirement here? Of course, Texas is saying the CCA's chain of custody requirement is just like any other chain of custody requirement. It's not. And what Fasano says is, much of the uncertainty inherent in this predictive exercise can be dispelled only by the tests a petitioner is seeking. That's 577F3rd at 576. And the point is, you don't know what you're going to get from testing until you do it. And what we also know about the DNA testing technology, which is highly relevant in this context because we're applying due process principles, what's arbitrary, what's fair, to DNA testing technology, is that we can get probative results even where there is contamination. I want to read you just one sentence from the amicus brief from Chase Baumgartner in the Supreme Court about non-contamination. Chase Baumgartner spent eight years as a lead DNA analyst with the Texas Department of Public Safety. And what he says is, even with the potential contamination of this belt, if an interpretable DNA profile is developed from the belt, the mixture deconvolution software could determine if Reed or Mr. Fennell are true donors or non-contributors to the DNA profile with higher than 95% accuracy. I guess my problem is, she and Fennell were living together, right? That's right, Your Honor. So I want to- Yes. So how does the existence of Fennell's DNA exculpate your client? So I think this has to do with concentration, which is something, again, that the technology can get to, which we can talk about from- So your guy's DNA is found in the semen, right? That's right, Your Honor. Which, you know, the only way you can get around that is by saying that was deposited voluntarily days before. But Fennell's DNA could have been deposited at any time. I just don't understand your point. Your Honor, I'm going to resist the question on the following grounds, because I think it's directly contrary to what Fasano's reasoning is here, which is that you don't know what you're going to get from testing until you try the test. But you don't have a post-conviction- I mean, again, maybe I'm moving over to the second criterion in the statute, but the way I understood this post-conviction testing, the point of it is to show that there is extraneous DNA that is totally inconsistent with whoever has been convicted. Let me give you a couple scenarios that would exculpate Reed. Is this on materiality now? Well, I think it relates to both, because I think the question here is, well, why doesn't the non-contamination requirement make sense? And I want to explain also why it doesn't make sense to have a non-contamination requirement. It's purely arbitrary, in other words. And I think that's what Fasano is getting at and what the science is getting at. And we're talking about Reed's case by way of example, Judge Delrub, because, of course, this is going to be a problem in other cases as well, as it was a problem in Fasano as a matter of interpreting the federal law there. If you were to test the belt, and Reed's DNA is not on it, and Fennell's DNA is on it, how on earth could Reed be responsible for the murder? We know that the murderer held this belt, and the prosecution said in the trial, in Essay 49, it was three to four minutes of pressure holding this belt against Stacey Seitz's throat to choke the life out of her, okay? And so that's going to leave sweat and skin cells all over that belt. So webbed belt, those sweat and skin cells are going to get into the webbing. Reed's DNA, if he were the killer, would be in there in that way. Similarly, if Fennell did it, he's going to have a high concentration of DNA all over the webbing of that belt. And we know from testing, they could take multiple swabs at different places, they could put it into their analysis, and they could come back and they could find, here's another possibility, that Fennell's DNA is 98% of whatever mixture. But that would be fine if this were pre-trial and you were talking about something that was suppressed or denied pre-trial and created reasonable doubt, but that's not your challenge at the present time. Of course, Your Honor, we're making a procedural due process challenge, but the point here is that Texas has, as the Supreme Court said in Osborne, reiterated again in this case, Texas has conferred a substantive liberty interest in proving one's innocence by not improving reasonable doubt, but improving that this would be the smoking gun that would prove innocence, which is why your co-counsel is the Innocence Project. Well, Your Honor, I think we'd ultimately, under Texas' Elizondo standard, have to show clear and convincing evidence that no rational juror would have convicted him of a crime, which I think is different than proving innocence. But in any event, the point here is we know from Osborne, from the Supreme Court, and also as reiterated in this case, in Skinner v. Switzer, that there have to be adequate procedures to access the new evidence to be able to vindicate that substantive liberty interest here. And to talk about the second point here, this requirement of non-contamination, we're not talking about any potential contamination, it's simply ungloved handling by people. And you know who those people are because, Judge Higginson, you have the chain of custody. Okay, that's another built-in here. We know who the jurors are, we know who's on the prosecution's team, we know who the court personnel are, and those people can be eliminated by taking reference samples, okay? So how many people would have to be tested in order to get down to what your theory is? Your Honor, once again, part of the problem with trying to answer these questions is that if you do the testing, you may be able to find out with 95 percent accuracy the answers to these questions, but you're not going to know ex-ante, and that's part of the problem. But you're plainly not saying that the only testing would be Fennel? Well, what Texas, what Chase Baumgardner's... Now, why don't you just answer me? They would, as a matter of protocol, they would also try to take reference samples from anyone they could get reference samples from. And that would be normally what they would do because this isn't the only case somewhere there's contamination. It can happen all the time. And if the court looks at Chase Baumgardner's brief, you'll see all different kinds of ways and DPS has all kinds of ways of dealing with that as well in a reliable way. Your theory of materiality would be either Fennel is on it in some high concentration or your client's not on it at all. It's not a requirement that there be both. It doesn't have to be either, Your Honor, right? One exculpates. The other doesn't necessarily. It inculpates the first suspect, right? The husband was the suspect to begin with. This goes to the second unconstitutional requirement of Article 64. But evidence that inculpates someone else also, of course, exculpates the accused. Not necessarily. It has exculpatory value, Your Honor, and we can discuss that. But once again, the constitutional problem with Article 64 here is it makes conclusive presumptions. It says we're not going to look at evidence that inculpates the accused. We can point you to Holmes v. South Carolina, the Supreme Court case, where they look at a South Carolina rule that basically says if there's enough evidence favoring the prosecution, we're not going to look at any third party inculpatory evidence. I mean, this isn't meant to be a hard question, but if all other states have post-conviction DNA regimes that have some version of diligence, materiality, and chain of custody, and yet none have found a due process fundamental unfairness, your argument has to be that the CCA really tortured one of these elements. And that's what you're saying right now, right? The non-contamination requirement is so fundamentally unfair. Set aside a normal chain of custody. I'm still struggling, because if you ever had contamination, wouldn't that defeat chain of custody? So isn't that the rule in every state? No, Your Honor. So Fasano makes clear this is not the rule under the federal law. OK, but could you argue with citation to any court's assessment, federal or state post-conviction DNA states? I would point you to Nebraska, State v. Pratt, 842nd, Northwestern Reporter, 2nd, 800 at 810 to 12. Is that in the brief? I know it's in the district court briefing. State against lower? State v. Pratt, 842nd, Northwestern, 2nd, 800 at pages 810 to 812. OK, and what are we going to find there? You're going to find a very similar analysis to Fasano, where the court is saying we're not going to. As to a post-conviction DNA regime. I believe that's right. OK, that's helpful. But, Your Honor, I... Sorry, Judge Alright. Well, go ahead and answer Judge Higginson's question. No, that's fine. He did. He did. OK. Still, Fasano is about statutory interpretation, and we're trying to determine whether procedural due process law says that any state procedure post-conviction violates due process. And you're telling us that state v. Pratt is that smoking gun case that says that it's procedural due process and it's constitutional. Is that what you're saying? That's not what I'm saying. I want to clarify. I'm not certain, Your Honor, whether... Because there is no such case, is there? Well, I think we're asking for the first time for this court to hold that. Yes, I agree with that, Judge Alright. But I think the key point, what we're getting... I'm not saying that Fasano and Pratt are constitutional holdings. What I'm saying is they reflect the basic conception that it is arbitrary to hold the state and the prisoner to different standards here. Because we just want to move to this next point, which is that if you had contaminated DNA evidence, it would be good enough to lock someone up. It's not good enough to let them out. That's essentially what we have. We know, and I haven't heard the state disputing this, that if you had the same type of contamination, the prosecution can still introduce that evidence at trial. And then, you know, Your Honor might ask, well, trial versus post-conviction. But of course, the defendant's liberty interest is at its peak, at its zenith, as a matter of procedural due process, during the trial. And it's still fair to have that evidence come in. Why? Because it's a question of weight, not of admissibility. Brady is going to protect you, right? If the government tests and they find it favorable, they'll offer it. But if the government tests and they find it unfavorable, as you're suggesting, they have just committed a Brady violation if they haven't turned it over pre-trial. Everything changes post-conviction. I think the point, Your Honor, is that there is a conclusive presumption. There's nothing we can do. We can't put on any amount of scientific testimony saying, as Chase Baumgardner said, we can get reliable results from this. Here's what it could show. How do you explain? That's arbitrary. Excuse me. How do you explain the fact that a number of prisoners around the country, and maybe this isn't directly related, have, in fact, been exonerated when they did, in fact, take advantage of these post-conviction DNA testing? Well, of course, Your Honor. If what Judge Higginson characterizes as the chain of custody materiality and timeliness, if those are embodied in just about all of the statutes, how can you explain the successful use of these statutes? Well, Your Honor, I think it goes to the point that Reid might well have been successful if there weren't this non-contamination requirement, because he could have had the murder weapon tested. The murder weapon is what we're talking about, trying to have that tested here. And I don't know why— That's not the test. The test is not, well, could—one case, could you win? That's not the test for whether it's a procedural due process violation. No, so, Judge Elrod, the point I'm trying to make is that it's arbitrary to say we're not going to allow testing because we're going to conclusively presume at the outset that simply because there's been handling of the evidence, there can be no probative results. Can we ask you about— Sorry, go ahead. Undue delay requirement? Are you simply disagreeing with the Texas Court of Criminal Appeals about whether touch DNA testing was available prior to this statute's 2011 amendment? Your Honor, while I think we do disagree with them, we're not making a Rooker-Feldman attack, a Rooker-Feldman-Bard attack on the holding here. We're saying that what's unconstitutional about the standard, as the CCA has articulated it, is that it's punishing prisoners like Reid who have been diligent for trying in multiple ways. There are multiple habeas applications to prove their innocence and then saying, you know what, as a matter of fact, you're not diligent. You can't get this test. Are your other claims under the Eighth Amendment, Texas Constitution, et cetera, still live? They weren't briefed in the most recent round of briefing. Do I assume that those are not before us now? I think, Your Honor, they rise and fall on whether we've shown a due process violation here, essentially a flow from the due process question. When you say the murder weapon, there's intuitive appeal to that, but every single homicide with a firearm, would the logic of your opinion be that if somebody, how long did he wait after the incident until he requested the DNA? How many years passed? How many years? How many years in this case passed before he wanted DNA testing on the murder weapon? Well, I believe he asked— That's an answer. In 1999, I think he asked right away, and then when touch DNA testing really only became available— I know in terms of when it became available. My point, though, is what's the limiting principle to your position? Of course, any gun, even though they're resistant to fingerprints and DNA, your theory would suggest no matter who had handled it, you'll always get DNA testing? Every petitioner will always on the gun? I'm not sure— On the logic that— I'm not sure that's right, Your Honor. But what's the limiting principle? So we're not challenging whether there can be a chain of custody requirement generically. We're challenging this non-contamination requirement. We're not challenging whether there can be, you might call it a materiality requirement or exoneration requirement generically, just like there is one in the federal statute as well. Those are just—it's just a different kind of requirement. And what this— But if it's undisputed that multiple people, not through willfulness, have handled the murder weapon, you're saying every single one of those firearms you would be able to get post-conviction testing on? I'm not saying that, Your Honor, because I think you would have to run that through the materiality inquiry and look at the rest of the evidence in the case. But what I'm articulating here as applying—as discussing Rodney Reed's case is how would the evidence that we might expect to find, which we won't know unless we test, how could it affect whether or not a decision-maker looking at that evidence would say there's a reasonable probability he's—he could be innocent? Were you trying— Can we ask about the habeas? Yeah, I was going to ask about that. You go ahead. Didn't Mr. Reed bring ineffective assistance of counsel claim in his first federal habeas petition alleging that his trial counsel should have known at trial that the testimony was incorrect? Well, so, Your Honor, if you're referring to the NAPU claims that we're making about the false forensic testimony here, I think what's different about the NAPU claims now is not—like, the science has always been wrong. That's correct. But for the first time, we have Dana—Doctors Dana and Dr. Farley at the 2021 hearing saying that what Blakely said and what Bayardo said was wrong. And there were misrepresentations, and they were misleading. And I just point you to the string of pages, essay 558 to 582, where there's the colloquy, and they talk about why what Bayardo and Blakely had said was wrong. At that point, it's the first time you have the state really acknowledging that this was false, even at the time it was— Well, they don't say that the prosecutors knew or should have known. They just said it was incorrect. Well, so, I think what I would say, Your Honor, is that there's a prima facie standard that applies at this point. The Court's not evaluating the merits or the factual or legal of these claims. What it's doing is saying, if you assume the facts as we put them in the petition, are those facts enough to—is there possible merit to the claim that if the withheld evidence had been provided, no reasonable juror would have found Reed guilty? So if we talk about all the different evidence we're missing here, we would have had credible—doesn't matter if it's credible, because the State court's fact findings are relevant for this purpose in the 2254b2 standard. There would have been evidence that Reed— Relevant at that purpose, but they would be—if we were to agree with you and give you a successive petition, the CCA's finding in the 10th and the 11th writs, those findings of fact would be a court of deference, correct? I'm not going to say they'd be a court of deference. The district court would have to do both the 2254b2 analysis itself, not a prima facie version of it, but a true analysis, and then do the 2254 analysis as well. And then questions of deference arise, but, of course, there may be ways to strip the either unreasonable determination of facts or unreasonable application of the law or contrary to or procedural default. There's any number of things that come up, but that's just— It's hard for me to believe that having been represented by your firm for well over a decade now, that you weren't guiding the State courts to make determinations that were under the appropriate standards. Your Honor, there—we, of course, disagree with many of the things that the State courts are doing, but the suitability determinations are not relevant for purposes of the prima facie analysis, precisely because the district court, that's the way the whole 2244 and 2254 analysis is supposed to work, is supposed to take a closer look if this court authorizes us to proceed with the successive petition. Thank you. I'm going to reserve the remainder. Okay, Ms. Vandell. Both of you lawyers look young—look as if you weren't even born. Thank you, and may it please the Court, due process does not dictate a one-size-fits-all post-trial DNA testing scheme. Instead, Osborne gave the States wide latitude to balance two strong and sometimes competing interests—the power of DNA on the one hand, with the importance of finality on the other. In doing so, Osborne recognized that statutory schemes across the country, including the States, all share similar features, despite also having variations between them. And yet, Osborne explicitly rejected that there is any one right way to do this, and it left only slim room for constitutional challenges to those statutes—so slim that, as Judge Higginson noted earlier, no circuit court has ever found any State's DNA statute to be unconstitutional, and Reed's mere quibbles with the CCA's decision in his case make it such that he should not be the first. The district court's dismissal should thus be affirmed. Now, before getting into Reed's specific complaints about Chapter 64, which, again, as Judge Higginson noted earlier, are similar features—diligence, materiality, and chain of custody—all feature in many statutory schemes across the country, I would like to take a step back and kind of address some of the questions your Honors were raising earlier about the true framework that is at issue here, because this case comes to this court at the intersection of three legal principles. One is a procedural due process claim. Second is a facial challenge. And third, of course, is the initial pleading stage. Turning first to the procedural due process claim, that has two elements that a defendant would ultimately or a plaintiff would ultimately have to show. The first is that there is a liberty interest, and there's no dispute here that there is. Texas chose to give defendants the right to seek DNA testing. So it is a limited liberty interest, especially in light of the fact that this is post-trial and not pre-trial, but it is one that does exist. And the second element is that the plaintiff must show that the state procedures violate some fundamental principle of justice. This second element is extremely difficult to meet and an extremely high burden to show. It's described in Osborne as requiring a showing that the procedure offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked fundamental. Now, that standard is not new. It comes from Medina v. California, which is cited in Osborne. And what that illuminates is the various ways a plaintiff could show that there is a fundamental principle of justice, and it talked primarily about three things, two of which are found to be highly probative to the inquiry, and one of which are found to have only limited relevance. The first way, the highly probative way, is that a petitioner can show that there is historical practice that recognizes the fundamental principle at play. And historical practice is defined in those opinions as going to the time of the ratification of the 14th Amendment, not just the last few years or the last 20 to 30 years, but again, centuries old, including even English common law. Just since you have a good—the regime is helpful to hear, but let's just, I think, put it right in the hypothetical they've been pressing. Would it be fundamentally unfair to have a chain of custody requirement that will always defeat a request for DNA if the state itself contaminates the evidence? No, Your Honor, and I think that is immediately belied by, for example, Arizona v. Youngblood, in which the Supreme Court explicitly acknowledged there that fundamental—and refused to read into the fundamental fairness requirement that preservation must occur at all costs. The only thing that it recognized there— But the preservation can't be defeated if the state mishandles the evidence. That's sort of what I'm throwing at you. And in the brief, it seemed to me you were saying, well, there's a presumption of good faith. But let's just imagine there were facts to suggest there was deliberate break of chain of custody. That—presumably, you'd say that would be a due process violation. I think— Yeah. I'm sorry. Yes, I think it could. However, I will acknowledge that—or I will point out, Reed has conceded that there is no evidence of bad faith here. That is not the facts of his case, nor is it the fact that the CCA was deciding upon. So that would be a different case. And I think conceivably, if there was a situation where the CCA was interpreting chain of custody to be defeated even by bad faith on behalf of the state, that might approach closer to a fundamental fairness issue. But that's not what happened here. And— What exactly did happen here? What happened here was it was actually completely routine handling at the time. It was normal practice to handle that evidence ungloved because this was prior to TouchDNA being in existence. And my opposing counsel points out in his briefs that there is now a statute in Texas that requires preservation. That statute didn't exist at the time. So what the state did at the time was normal. And it did so under the belief that DNA testing was completed. I think, in particular, Reed had an expert who had access to the DNA prior to trial and was allowed to test. So when the state passed around this evidence at trial under then-appropriate existing protocols, it did so under the good faith belief that testing was done, especially not knowing that TouchDNA would become an issue at the time. So if the same belt existed as to a crime now and it were passed around, this first element wouldn't be an obstacle to getting DNA testing? Is that what you're saying? In light of the fact that now DNA touch testing—is that what you're saying? Likely not under the statute. I think the state has a duty to preserve that. It would not be handling or passing the evidence around ungloved. But I also think it's important to note it was not only the state handling the evidence. It was Reed's attorneys as well. So to suggest that it's only the state who broke the chain of custody is belied by the facts of his case. But again, the facts of his case are not the question under fundamental fairness. It is what principle of justice would that have— Remind me again. What did the CCA—what were its exact words as to contamination being a gloss on chain of custody? Yes, Your Honor. And I think that's actually a very important point here. The CCA never held exclusively that contamination is the reason that chain of custody was broken. In fact, every single time it made a finding, it said contaminated, tampered, or altered with. That's because contamination is a synonym of altered. It is a synonym of tampered. And in particular, one—and I can get the site for you—but on one page in the CCA's opinion, when they describe the problem with the integrity of the evidence, they specifically note, and I quote, Reed's expert's testimony on a suggested approach to mitigate the effect of the evidence's alterations does not undermine the judge's determination that the chain of custody doesn't exist. The description of what happened here was that it was altered. Contamination is a form of alteration. And I think Reed's argument fundamentally folds on the idea that it's just unseen. Touch DNA, we can't see it. And his idea that this is somehow violated by what would happen at trial is just that no one can go independently verify that it's been altered, but it has. The surface of those items has been altered by the addition of DNA evidence that wasn't there previously. And I would like to address a point that my co-counsel made earlier, or my opposing counsel made earlier, that this is just easily resolved if we go get reference samples from an untold number of people that could have contributed samples. And again, it's at least two prosecutors, two defense attorneys, the ME specifically, the medical examiner specifically used the belt to demonstrate how this murder occurred at trial. And the evidence was put in a box with other physical evidence and sent back to the jury room during their deliberations. As Justice Alito noted in his concurrence in Osborne, even if all those jurors touched it, that doesn't account for who they touched and then transferred that evidence to. Let's imagine the theory weren't it's inculpatory of Fennell or anybody else. It's just if it has no DNA touch evidence as to read. I think there's questions. That could be highly material, even if a lot of other people's DNA is there. I think, again, this kind of comes back to the threshold requirement. And there is a problem with touch DNA in that it often isn't deposited in threshold where we can get any evidence at all. But it still doesn't, I think that puts the cart before the horse. And it makes it a circular argument that the courts must assume these despite a obvious chain of custody issue. And there is. And I think I would like to, I'd be very curious actually on this argument that where he would suggest that if we got Fennell, even though we know that this was contaminated with other items he touched, with other items from his truck in the same box and commingled there, if we got Fennell's profile all over there, obviously the state's position is likely that that would just be contaminated and transfer. The box with the belt also contains her clothing, including her underwear and her pants, which we now know via post-trial DNA testing that was agreed by the state, came back to Reed. So if Reed's testimony or if Reed's evidence, excuse me, his DNA profile is now all over that evidence, would he concede that that's reliable testimony or reliable evidence that it is him? That it doesn't culpate him? Or would he likely argue that it's been contaminated? And I think that goes to show why the CCA and why the state courts are perfectly empowered to make a decision that that risk is too great, particularly in light of the balance that Osborne requires and the finality of conviction here, that it will not permit unfettered access to unreliable, speculative, maybe even false testimony that could potentially only even be resolved if the state was required to force innocent trial actors to give their biological samples such that we can use them as a reference sample to resolve contamination. I think there are just too many speculative steps in that analysis. And where Arizona v. Youngblood explicitly acknowledged that fundamental fairness does not require this sort of preservation, it acknowledges that evidence can be destroyed. It acknowledges that evidence can be neglectfully destroyed so long as it's not bad faith. And that's effectively what's happened here. While the evidence still exists, it's basically been destroyed for these purposes. And I think— Do you want to mention Fasano and if you're familiar with it, Pratt? Yes. So Fasano, to Your Honor's question earlier, was a post-trial case. It was not a pretrial case. However, I just don't think it informs the question here. As Judge Elrod pointed earlier, none of these cases are addressing the fundamental fairness problem. This court was interpreting the federal statute in its supervisory role. It's perfectly permitted to do that. And it's perfectly permitted to decide how it's going to read contamination, which, though I will note, is explicitly in the federal statute. And as far as I could find, this is the only court who said that contamination listed in the statute should not be considered in the chain of custody requirement, though it is explicitly listed. So I don't think that informs the question at all about whether this is fundamentally unfair. And as it goes to the Nebraska case, again, they were just interpreting their own statute. They were not themselves addressing a procedural due process claim. The idea—and this is also from Medina—the idea that contemporary practice may—you may be able to point to one or two examples of courts not getting to the same place that you did doesn't make it fundamentally unfair if there's an absence of consensus, if there's an absence of well-settled recognition that there is a fundamental fairness principle at play. It needs to essentially be overwhelmingly the case that every state that has a statute like this would not consider contamination the same way. And that's belied by the fact that the federal statute has the word contamination in it. And 10 other jurisdictions specifically list contamination as part of their chain of custody requirement, or they interpret by the law that contamination is part of that. Because, again, it's uncontroversial that contamination, as Your Honor pointed out is a form of breaking the chain of custody. Chain of custody is an art—is a term of art. Can we switch gears for a second? Your friends on the other side in their brief, reply brief, said—say that under the TCCA's interpretation of Chapter 64, scientifically disproven evidence or recanted testimony offered at trial can foreclose post-conviction DNA testing even if the incarcerated person could show that he was innocent. Is that correct? Yes, Your Honor, and I think I would phrase it as what they would suggest is that the CCA unconstitutionally does its materiality analysis to only insert the new DNA testing results into the trial-based evidence. And it does not allow for essentially a freestanding, expansive, all evidence that's ever happened since the trial to be considered in that analysis. I think that's how they would phrase that. Would that enable false testimony to be used to secure conviction, which the government may not do? Is that a backdoor way into elevating that? No, Your Honor, because, again, this is not a specific way to get relief itself. I think the state courts are allowed to have a limited inquiry that strikes that balance between the power of DNA and the finality of conviction. The state court is not saying that it's going to uphold the conviction based on that allegedly false testimony. In fact, if he were to get the DNA results, then he would be able to raise new claims and likely he could raise a new actual innocence claim that would permit exactly that inquiry. All it's saying is that as a threshold matter, we basically need it to be obvious from the record that this evidence matters, that it has some effect on, for example, the trial theories that were at play or that there was any credible evidence at all that would lead to this having any conceivable outcome. Surely, if the testing was permitted and there are a whole bunch of other due process violations and that would be considered via whatever vehicle the defendant chooses to take the DNA testing results and raise a claim in, whether that is a subsequent writ in the state courts or a subsequent petition in the federal courts. So I think the question is just whether due process, again, would require a specific type of inquiry. Whether due process dictates that the state court must use only one analysis here. And when the alternative that he's suggesting would effectively be to permit the state courts to do an entire actual innocence inquiry at its threshold matter in order to determine whether evidence can eventually result in his actual innocence, practically speaking, I don't know how that works and I don't know how due process could require that. With regard to the habeas petition, would there have been sufficient evidence to sustain a conviction without Ms. Blakely's testimony? Yes, Your Honor, there would have. I think Ms. Blakely was cross-examined on exactly the sperm, the intact sperm question and whether the study actually supported what she said it would. She admitted that it wasn't necessarily the end all, be all, though she still emphasized that she believes, and in her experience, it is often close in time deposits. Dr. Briardo, and I think important to note here, is he did his own analysis of the sperm more than maybe 36 hours after his own estimated time of death and still found intact sperm. So what was before the jury is that the medical examiner found intact sperm outside that 24-hour window. So I don't think that in light of that, any of the new evidence he's relying on would do anything to make it reasonably likely for purposes of the authorization motion that he will show the actual innocence standard. The CCA looked at this exhaustively. Cert's gone up and been denied, correct? Yes. But back on just the question of deference, do we owe any deference? And you cited Kinzel, I think? Yes, Your Honor. What's your position as to whether at this stage we would look at, because they covered the NAPU, they covered the Brady issues, the forensics, Cardenas, us. They covered everything factually. Yes, Your Honor. The director's position is, as illustrated in his brief, that those factual findings should, in fact, get E1 deference under 2254, even at this initial gateway. Reed points out in his reply that there is a published case in Reese Waringen, I believe, that suggests in a footnote that the state court's credibility determinations have no relevance whatsoever. But the case that Swearingen cites is In re. Wilson. And the most common application in which this court says that there is no relevance of the state court determinations are cases under 2244B2A, which are the new rule cases. And those cases are only supposed to be showing whether there's a new rule by the Supreme Court that's been directed to them. It is kind of evident that on the text of the statute, the state court findings would have no relevance to that inquiry, nor would the adjudication have any relevance to that inquiry, because it's not supposed to be, really, about the facts at all. I don't think that Swearingen's footnote parroting of that rule makes it such that under new facts cases, like Reed's, that this court has to look at that in a vacuum, as if the state court did nothing at all with it. I think that's also evidenced by the In re. Raby case cited in that brief, in which this court did quote and implicitly approve of the CCA's fact findings from the Chapter 64 proceeding to make the actual innocence inquiry. Am I right that the CCA, as to the HEB co-workers, Cardenas and Haas, it at least assumed that those statements to the prosecution team had not been turned over? Yes. I think it's fair that the actual written statements that were turned over prior to the hearing, it seems that it assumed that that actual statement was not turned over. However... Is Texas's position that their comments that there may actually have been some relationship is sort of harmless, or is it a materiality point? What's the argument that you're making? So it is materiality, essentially, under the actual innocence inquiry, which that analysis actually, going to Your Honor's question earlier about the 1983 and whether we consider post-trial evidence or what we do with it, that is the 2244B analysis for actual innocence purposes. You take the evidence underlying the alleged constitutional error, you insert it into the trial, and then you make the determination. So yes. It was too speculative, it was too inferential. Yes. I mean, it's... It was a sexual relationship. Yes, Your Honor. It's hearsay based on speculation that the state ran down and no one admitted anything. But on top of that, whether the statements themselves were suppressed, the witnesses were available. So for diligence purposes, there's also a question about whether a reasonable attorney should have questioned these witnesses to develop evidence about a supposed relationship when that was their theory at trial. Excuse me? Brady's your duty. If you had witness statements, you would affirmatively have to turn them over whether they knew about the witnesses or not, right? I would agree that the statement itself under Brady, but the question under the 2244B analysis is not whether there's a Brady suppression issue. It's whether there's diligence. And as this Court has held recently, in fact, in re-Cantu, the idea that there is suppression does not absolve the diligence inquired for 2244 cases. The witnesses were available. So they didn't have these witness statements. But the question is, could they have? Could a reasonable attorney in that person talk to, for example, Andrew Cardenas was not just a random HEB coworker. He was the one who was waiting for her the night that she was supposed to show up and didn't. He called her mom to let her know that she wasn't there. That was testified to at trial. And again, for diligence purposes, it's not just trial, which is what Brady would go to. It's also any time between trial and the initial federal petition that was filed, or if there are successive ones, then the successive one as well. So the question is truly not whether the state suppressed that evidence at trial, but whether at any time in the 14 years from when he was tried to when the district court finally denied relief, some attorney of the many he's had could have reasonably been on notice that this was someone they should chase down. And that's another reason why all three witnesses fail. I'd like to address one last question on the diligence issue, going back to the 1983 proceeding. Judge Elrod, you were correct. That he is simply disagreeing with the CCA's decision. And I think this goes and is particularly highlighted by this is a facial challenge, as he's emphasized in the Supreme Court, as he emphasized today. And so what he actually needed to be showing is not the text of the statute, which is not his claim, but the authoritative interpretation, and there is none. There is no broad pronouncement when the CCA makes a determination on diligence. The only broad pronouncement is that diligence is a fact-intensive inquiry that is circumstance dependent on the case. That is what they did. They took Reed's facts, and they found that he in particular wasn't diligent. His attempt to generalize his facts to extrapolate a rule falls flat when ultimately it's truly just he disagrees. He thinks the CCA should have found him diligent. So again, coming back to this idea of this being a facial challenge, which also means he had to show the facts beyond his case. And that no set of facts would be applicable or constitutional. And then you couple that with the procedural due process component of how this is fundamentally unfair. His complaint failed at every stage of that analysis. JUSTICE GINSBURG-RODGERS And the other judges have asked you whether Mr. Reed would have to prevail on all three points of the statute in order to succeed. What is your response? I think, as Judge Higginson alluded to earlier, under the Gutierrez case currently, yes, it appears to even have standing. He would have to succeed on all three, because if there's any basis upon which Gertz or the CCA would again deny, it seems to deprive him of standing. However, that's obviously been reviewed or petitioned to the Supreme Court, so it's kind of an outstanding issue. But I would encourage, again, on the merits of the claim, I think it's indisputable that he failed to show at any stage in the proceedings that this is fundamentally unfair. And as such, you know, he presented a full-throated case for what he thinks the state legislature or the CCA should have done as a matter of best practice effectively, especially if it were to be a result that he benefits from. But mere disagreement with the legislature or mere disagreement with the state court doesn't come anywhere close to stating a procedural due process claim. Just remind me where we started again, because it seems to me now, listen, his strongest case is focused solely on the murder weapon, just focused on that. He's saying, accepting that many other people's touched DNA will be on it. If the test would show that Reed had no DNA on it, that would be highly exculpatory. So why, again, would chain of custody block a test, a request, just to see if he wasn't on it? Admit the rest of the world's on it. If you wore gloves, would you have DNA? Could I get counsel's answer, please? Oh, I'm just asking. No, I'm just, could you answer my question? So the hypothetical would be if 15 people touched it, but Reed's not on there, assuming that his would have deposited enough of a threshold to make that determination. I think that's part of the problem. With also the specific testing that he's asked for here, the thresholds and the amount that is left is not always going to be indicative of it being exculpatory. It's not a chain of custody objection to it. I agree, Your Honor. And, and again. How does chain of custody prevent a petitioner whose theory is exclusively that on a strangle ligature where there was huge force, if there's nothing of his, how would the state be able to say you don't get that because of chain of custody? Because chain of custody is supposed to be tied to the offense, and it can no longer be said that that's the case. I think, again, it's sort of the circular argument that he presents, that we would presume the result that he wants and work our way backwards to suggest that once we do the testing and we discover that there was never a chain of custody problem in the first place. And that's just not what due process requires. I think it's, sure, if we went and we tested every single thing he wanted always and then worked our way backwards to chain of custody, then there would be no point in having a threshold analysis at all. But every state does. Every single state requires some chain of custody in some way. The question that he's presented is whether you can read a synonym to any of the ways that that's established. I think it is difficult to say that the end result just, like, basically the end justifies the means. And I don't think that's what due process requires that a state must do. Thank you, Your Honors. Okay. Mr. Rider-Long-Maiden. Thank you, Your Honor. Just a couple quick points on the DNA case. My friend on the other side said if we presume the result that I want, but of course the actual test under Article 64 is you presume that you could exclude the offender. And that's, I think, Judge Higginson, exactly what you're asking. They never got to that point with the belt because of the non-contamination inquiry. And what I didn't hear from my friend on the other side or see in the briefs is any state that has a similar non-contamination requirement read into its chain of custody requirement. So if we're talking about the practice across other states, I'm not seeing it. And talking about what the practice was at the founding is a difficult thing to talk about when we're talking about DNA testing, where it's a new context to which we're applying. I'm not sure my difficulty is contamination, though. I'm assuming contamination. Now I'm wondering, you know, just in any of the 50 states, if you have a chain of custody, it would seem like the logic of your argument is you would always get the murder weapon because if the defendant's DNA touching wasn't there, that would be a powerful exculpatory point. I think it goes, again, I think, Your Honor, I'll go into the materiality question because it depends on the circumstances of the case. But if I could also move on to just say a couple things about the habeas case because we had a few points about Brady and also about what the standard is. But aren't there 10 states at least that have a chain of custody requirement contrary to what you just argued? Maybe I missed that before. Your Honor, I think there are multiple states and the federal government that have a chain of custody requirement. But the question isn't whether you have a generic chain of custody requirement, which allows the courts to know and law enforcement to know where that evidence has been. It's about whether they say handling without gloves itself is conclusively presumptive that you're not going to be able to get any probative results. That's the requirement that we're challenging as unconstitutional. It's not a chain of custody requirement writ large. As to the habeas case, this court has said multiple times in so many words that state court findings are wholly irrelevant to the inquiry about whether a movement has made a prima facie showing of entitlement to proceed with a federal habeas petition. We have In re Wilson, 442nd F3rd at 878. But of course, if you look at our reply brief and the habeas motion, we also have Johnson and Cathy saying the same thing. I think it's well established that those are questions downstream for the district court, which, yes, has to look at this closely under 2244 and 2254. But this court's gatekeeping function, much as in the certificate of appealability context, is just has this initial showing been made? And so you're just looking at the assuming that the, and the court also said in the reply brief, assume the merits of the asserted constitutional errors. And look at you can write whatever you want, but every what contention are you making for successive habeas that you have not already made and that has not been rejected by the state courts? So your Honor, of course, again, I just don't think it's relevant under the standard. But in any event, we have we have might be relevant under Rule 11. We have Susan Hugen for the first time. We learn about her in this letter that in 2021, Austin Cardenas as well. But I didn't hear anything about Susan Hugen. She, of course, worked at HGV with Stacy sites. She was introduced to Rodney Reed. She saw them laughing, giggling together, thought they were more than friends. This is evidence that the two knew each other and has some form of something about 2021 testimony by Miss Hugen where her credibility was undermined. Am I thinking of another witness? So your Honor, but this is exactly my point. What the state court said about her credibility is not part of the prima facie analysis. But it is. But it is part of the fact findings that a court would have to look at eventually. I think a court could. You can't just piecemeal the whole trial. Your Honor, I'm not disputing that the district court has to look at this under 2244B2 itself and under 2254. I'm just pointing out that there are things that under the prima facie standard, this court has to look at and weigh against what reasonable jurors could have thought. And what duty, if any, do you have under Rule 11? I'm not suggesting that you violated Rule 11, but I do suggest that if you say, well, this is a prima facie case, and therefore we send it back to the district court and keep this ball up in the air a few more years when you know that you will ultimately lose because the state court found these people not credible. Well, Your Honor, I think we have reasons that we've gone into in the briefs. We actually discuss this in the briefs, even though, as we explain in the briefs, the 2254D standard is not at issue. But we go through and try to show why there are reasons that the state court's analysis wouldn't be entitled to deference, including the fact that this state, this was a nine day proceeding. They heard from 47 witnesses and then ultimately rubber stamped the state's proposed findings. That's exactly what you told the Supreme Court. Your rubber stamp argument was in your cert petition. It is, Your Honor. But, of course, the Supreme Court decides whether to grant review or not grant review on a number of criteria. It's so artificial for us not to accord deference to something you took factually all the way to the Supreme Court. Well, except, Your Honor, I think, again, the standard is that you're not according deference at this initial stage precisely so that the district court can take a closer look. And I just, last point about Brady, if I may, is that In re Will 970F3rd at 543 says, Council may rely, absent notice to the contrary, on representations by the prosecutor. Yes. What other petitions are pending, state or federal court, in this case? There's a Rule 6CB motion before the district court right now to reopen the first federal habeas case because, of course, we're learning about the Haas, Cardenas, and Hugin testimony for the first time. And that was, we didn't know about it until now. Okay. So it's on a fraud basis, yes. Thanks. So we ask that- All right. Thank you. Thank you. Thank you.